# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

Bradley Earl Wallace,          )
                              )
       Plaintiff,          )
                              )
v.                           )      No. 14 CV 50359
                              )      Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting      )
Commissioner of Social Security,    )
                              )
       Defendant.        )

## MEMORANDUM OPINION AND ORDER

Allegedly, Albert Einstein said that the definition of insanity is doing the same thing over and over again and expecting a different result.  Regardless of whether Einstein truly made this observation, this appeal is evidence that, at times, Social Security proceedings border on madness.  This is one of those cases.  This case involves a complete failure by a federal agency to follow a court order, which specifically found that the agency had failed to follow its own regulations.  Apparently, the agency believed that doing the same thing would produce a different result in a subsequent appeal.  The agency was wrong.

When the Court enters judgments and remands cases back to the Social Security Administration (Administration), it fully and reasonably expects the Administration will comply with the Court's orders.  There exist at least three reasons for this expectation.  First, Court orders, after all, are not merely musings and suggestions. *McCann v. Cullinan,* No. 11 CV 50125, 2015 U.S. Dist. LEXIS 91362, at *5 (N.D. Ill. July 14, 2015).  Instead, court orders are binding judicial decisions that must be followed.  *Id.*  Second, according to the Administration's own operating procedures, court remand orders are transmitted to and disseminated throughout the relevant portions of the Administration.  HALLEX I-4-3-1.  Indeed, the Administrative Law

1

Judge (ALJ) in this case was fully aware of Magistrate Judge Kim's 26-page order previously entered in this case. R. 448. The ALJ chose to ignore it. The ALJ's disregard for Judge Kim's order is evidenced in the ALJ's sole description of the order. According to the ALJ, because of the remand, he was "to offer the claimant opportunity for a hearing and take any further action needed to complete the administrative record and issue a new decision." R. 448. But this was not the mandate of Judge Kim or even of the Appeals Council. Judge Kim ordered that the case was "remanded for further proceedings consistent with [his] opinion." R. 504, 531. Likewise, the Appeals Council "remand[ed] this case to an Administrative Law Judge for further proceedings consistent with the order of the court." R. 502. Perhaps it is not surprising then that the remainder of the ALJ's decision is silent on Judge Kim's order. Third, there exists a well-known doctrine called "law of the case." Courts have a compelling interest in continuity, finality and efficiency both within cases and within the greater judicial system, and the law-of-the-case doctrine is an important tool in reaching this goal. *United States v. Anderson*, 772 F.3d 662, 669 (11th Cir. 2014). The doctrine requires an administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart. *See Wilder v. Apfel*, 153 F.3d 779, 803 (7th Cir. 1998); *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991). Consequently, Judge Kim's order was binding on the ALJ, and plaintiff had a right to expect that the ALJ would comply with the order.

Unfortunately, in this case, the ALJ, the Commissioner and the Administration failed to comply with Judge Kim's specific and thorough order, remanding the case for violating fundamental Social Security jurisprudence, including, but not limited to, the treating-physician rule. *Wallace v. Astrue*, No. 11 CV 4350, 2012 U.S. Dist. LEXIS 117031 (N.D. Ill. Aug. 20,

2012).[1]  Sadly, this case is just one of many examples in which the U.S. District Court for the

Northern District of Illinois has remanded a case to the Administration, only to have the

Commissioner deny a claimant's benefits without rectifying the same errors that caused the

remand in the first place.  Indeed, this case is at least the fourth time the Administration has

failed to follow remands by judges in this district in just the last few months. *See, e.g., Koppers*

*v. Colvin*, No. 15 C 5471, 2016 U.S. Dist. LEXIS 73082, at *9-12 (N.D. Ill. June 6, 2016)

(Magistrate Judge Martin remanding for same reasons Magistrate Judge Mason previously

remanded); *Betts v. Colvin*, No. 13 CV 6540, 2016 U.S. Dist. LEXIS 52019, at *9 (N.D. Ill. Apr.

19, 2016) (Magistrate Judge Cox remanding for the same reasons Magistrate Judge Cole

previously remanded); *Accurso v. Colvin*, No. 12 C 8394, 2016 U.S. Dist. LEXIS 13330, at *32

(N.D. Ill. Feb. 4, 2016) (Magistrate Judge Cole remanding for the same reasons Judge Der-

Yeghiayan previously remanded).  The Administration must do better.

---

[1] This Court has attempted to document the Administration's repeated violation of its treating-physician rule.  The following list is a just a sampling of the most recent remands by the undersigned and the various judges of the U.S. District Court for the Northern District of Illinois.  *Edmonson v. Colvin*, No. 14 CV 50135, 2016 U.S. Dist. LEXIS 32019, at *16-20 (N.D. Ill. Mar. 14, 2016); *Vandiver v. Colvin*, No. 14 CV 50048, 2015 U.S. Dist. LEXIS 163328, at *6-10 (N.D. Ill. Dec. 7, 2015); *Carlson v. Colvin*, No. 13 CV 50341, 2015 U.S. Dist. LEXIS 129905, *19-21 (N.D. Ill. Sept. 28, 2015); *Koelling v. Colvin*, No. 14 CV 50018, 2015 U.S. Dist. LEXIS 140754, at *27-29 (N.D. Ill. Oct. 16, 2015); *Taylor v. Colvin*, No. 14 CV 50006, 2015 U.S. Dist. LEXIS 111300, *16-17 (N.D. Ill. Aug. 4, 2015); *Duran v. Colvin*, No. 13 CV 50316, 2015 U.S. Dist. LEXIS 101352, at *27-28 (N.D. Ill. Aug. 4, 2015); *see also Gonzalez v. Colvin*, No. 14 CV 5635, 2016 U.S. Dist. LEXIS 75707, at *13-16 (N.D. Ill. June 10, 2016); (Rowland, J.); *Koopers v. Colvin,* No. 15 CV 5471, 2016 U.S. Dist. LEXIS 73082, at*13-15 (N.D. Ill. June 6, 2016) (Martin, J.); *Stubbe v. Colvin*, No. 14 CV 10442, 2016 U.S. Dist. LEXIS 64554, *9-14 (N.D. Ill. May 17, 2016) (Cox, J.); *Montgomery v. Colvin*, No. 14 CV 10453, 2016 U.S. Dist. LEXIS 55074, at*15-19 (N.D. Ill. Apr. 26, 2016) (Cox, J.); *Fugate v. Colvin*, No. 14 CV 4240, 2016 U.S. Dist. LEXIS 33700, *25-28 (N.D. Ill. Mar. 16, 2016) (Rowland, J.); *Harlston v. Colvin*, No. 14 CV 1606, 2016 U.S. Dist. LEXIS 25286, at *24-30 (N.D. Ill. Feb. 29, 2016) (Mason, J.); *Lindo v. Colvin*, No. 14 CV 1106, 2016 U.S. Dist. LEXIS 23262, at *5-9 (N.D. Ill. Feb. 24, 2016) (Valdez, J.); *Padua v. Colvin*, No. 14 CV 566, 2016 U.S. Dist. LEXIS 21877, *21-26 (N.D. Ill. Feb. 23, 2016) (Valdez, J.); *Accurso v. Colvin*, No. 12 CV 8394, 2016 U.S. Dist. LEXIS 13330, at *41 (N.D. Ill. Feb. 4, 2016) (Cole, J.); *Schickel v. Colvin*, No. 14 CV 5763, 2015 U.S. Dist. LEXIS 165463, *38-41 (N.D. Ill. Dec. 10, 2015) (Finnegan, J.); *Middleton v. Colvin*, No. 13 CV 4483, 2016 U.S. Dist. LEXIS 151847, at *27-32 (N.D. Ill. Nov. 9, 2015 ) (Kim, J.); *Shaevitz v. Colvin*, No. 13 CV 1721, 2015 U.S. Dist. LEXIS 103480, at *6-10 (N.D. Ill. Aug. 6, 2015) (Gilbert, J.); *Moore v. Colvin*, No. 13 CV 7843, 2015 U.S. Dist. LEXIS 65901, at *31-38 (N.D. Ill. May 19, 2015) (Schenkier, J.).

This issue is not merely academic. The costs incurred because of the Administration's repeated violations of court orders are substantial. Besides the societal costs incurred when the Administration flouts federal court orders, the Administration's failure to follow orders results in real dollar costs to the treasury and ultimately the tax payers. There is the cost to the United States court system for judge and staff time spent on appeals. Thirty years ago, the estimated cost of court time was $600 per hour. *See Jaen v. Coca-Cola, Co.*, 157 F.R.D. 146, 151 n. 8 (D.P.R. 1994) (discussing the cost in 1985). A reasonable person can safely assume that expense is substantially higher today. And there is the cost to the other parties whose cases are delayed because judges and staff are needlessly working on successive Social Security appeals. Finally, there is the cost to the federal treasury because plaintiffs may be entitled to their attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. §2412, when they not surprisingly prevail. *Freismuth v. Astrue*, 920 F. Supp. 2d 943, 944-46 (E.D. Wisc. 2013) (identifying costs incurred because of EAJA fees in Social Security appeals); *Brandenburg v. Colvin*, No. 14 CV 835, 2015 U.S. Dist. LEXIS 105190, at *25-26 (E.D. Wisc. Aug. 11, 2015).

This Court will, once again, remand the case for essentially the same reasons it was previously remanded by Judge Kim. But this Court expects a different result, not the same inadequate and erroneous "analysis" twice provided by the ALJ.[2] Stop the madness.[3]

---

[2] If the Commissioner disagrees with this Court's order, the remedy is for her to take an appeal of the judgment, not to send the case back to an ALJ to ignore the order. Indeed, the Court encourages the Commissioner to appeal this Court's judgment, which will provide the United States Court of Appeals for the Seventh Circuit an opportunity to resolve various aspects of the treating-physician rule.

[3] For what it is worth, this Court is not alone in raging against the Social Security machine. *See, e.g., Freismuth*, 920 F. Supp. 2d at 944 ("Once again, the Court is charged with the unenviable task of deciding yet another in an exceptionally long line of Social Security cases run amok. This line of cases – the result of what might be charitably described as a wholly dysfunctional administrative process within the Social Security Administration – has continued to grow, bringing with it a skyrocketing number of remands.")

## BACKGROUND

On July 30, 2008, plaintiff filed applications for disability insurance benefits and supplemental security income. He believed he had bipolar disorder that caused "unstable mood swings" in which he would get "really depressed" and other times would be "almost in a state [of] euphoria about the world." R. 210.[4]

On September 5, 2008, plaintiff was evaluated by psychologist David NieKamp, who interviewed plaintiff for 45 minutes. Plaintiff reported "frequent insomnia due to extreme anxiety" and "extreme apathy where he does not want to leave his bed." R. 296. Dr. NieKamp diagnosed him with moderate-to-severe anxiety and depression and rated his global assessment of functioning ("GAF") as 45. R. 298.

On November 8, 2008, plaintiff was treated by Dr. David Pocock, a board-certified family physician. R. 323; Dkt. #15 at 2, n.4. Plaintiff reported that he was first diagnosed with bipolar disorder eight years earlier; that he had not taken any medication for it in the last two years; and that he had four to six manic cycles a year alternated with depressive cycles. Dr. Pocock noted that plaintiff was "jittery and nervous" and diagnosed him with bipolar disorder.

On December 17, 2008, Dr. Pocock urged plaintiff to get on the waiting list at the Ben Gordon Center for treatment for his bipolar disorder. Plaintiff was then sleeping only four hours a night. Dr. Pocock prescribed Abilify.[5] R. 326. On February 28, 2009, plaintiff told Dr. Pocock that he had stopped taking Abilify because it caused palpitations. Plaintiff's mother told Dr. Pocock that plaintiff had "clammed up" because he was depressed. R. 327. Dr. Pocock diagnosed plaintiff with bipolar disorder in the depressive phase and prescribed Prozac. R. 328.

---

[4] Plaintiff apparently was treated for bipolar disorder years earlier. As Judge Kim noted, a doctor diagnosed plaintiff with bipolar disorder in 2000, although there are no treatment records from this period in the file now. R. 507.

[5] According to plaintiff, Ability is indicated for the treatment of schizophrenia, bipolar disorder, and is used as an adjunctive therapy for major depressive disorder. Dkt. #15 at 3, n.6 (citing to www.rxlist.com).

On March 30, 2009, plaintiff was assessed by Dr. Samar Mahmood, a psychiatrist who would treat him over the next four years. The first meeting lasted 53 minutes. In a 5-page report, Dr. Mahmood noted (among other things) that although it would be "beneficial for Brad to learn effective coping skills to help him deal with his symptoms of Bipolar," plaintiff "was not interested in engaging in therapy." R. 337. Dr. Mahmood formally diagnosed plaintiff with bipolar disorder and assessed his GAF as 45.

About two months later, on May 29, 2009, plaintiff again saw Dr. Mahmood on May 29, 2009. This was a 50-minute meeting. Dr. Mahmood again prepared a detailed report, noting that plaintiff was taking Prozac as prescribed by his regular doctor, that he had tried Depakote for bipolar disorder but that it "made him feel worse and suicidal," that he had tried Abilify and Effexor but they did not help, that he had severe panic attacks, and that he has rapid cycling mood swings. Plaintiff's mother confirmed these reports. Dr. Mahmood again diagnosed plaintiff with bipolar disorder and social anxiety disorder and rated his GAF at 45. Over the next four years, plaintiff would see Dr. Mahmood about every three months.

On July 6, 2009, Dr. Mahmood completed the Psychiatric/Psychological Impairment Questionnaire. She diagnosed plaintiff with bipolar type I and assessed his GAF as 50 with a low of 40 in the last year. She checked boxes indicating that he would be absent from work more than three times a month, was incapable of "low stress" jobs, and was not a malinger. R. 358-59.

Ten months later, on May 10, 2010, Dr. Mahmood again completed this questionnaire, assessing plaintiff's GAF as 45 to 50 and his low in the past year as 40 to 45. R. 401. She again found that plaintiff was incapable of even low stress jobs and was not a malingerer.

On June 10, 2010, the first hearing was held. Plaintiff testified that he could not work because he "cycle[s] too often," which he explained meant "that in my high mode, I try to do

everything as fast as possible, and then when I'm on low mode, I don't do anything at all." R. 38. He was then taking Prozac and had tried Abilify for a short time, but developed "bad complications." R. 37. He had lost four or five jobs because of his cycling.

A clinical psychologist named Mark Oberlander testified as an impartial expert. He opined that plaintiff had bipolar disorder, an anxiety disorder, and a personality disorder, but stated that his treatment had been "seriously inadequate." R. 50-51.

On June 24, 2010, the ALJ issued his decision. The ALJ found that plaintiff had severe impairments of bipolar disorder, anxiety disorder, and personality disorder, but found that he did not meet a Section 12 listing. The ALJ found that plaintiff had the residual functional capacity ("RFC") to perform a full range of work with certain limitations. The ALJ relied heavily on Dr. Oberlander's opinions and gave "no weight" to those of Dr. Mahmood. R. 24-25.

Again, for sake of clarity, it is important to note that as of June 2010, both the ALJ (John K. Kraybill) and Dr. Oberlander found that plaintiff was, in fact, suffering from severe bipolar disorder.

In 2011, plaintiff appealed the decision to the United States District Court for the Northern District of Illinois (Case No. 11-4350).[6] In a 27-page opinion, Judge Kim remanded, finding that the ALJ violated the "well-established" treating-physician rule.[7] With GPS precision, Judge Kim identified numerous problems with the ALJ's decision, including the following. First, Dr. Oberlander overlooked evidence favorable to plaintiff.[8] Second, Dr.

---

[6] Although Local Rule 40.3(c) would indicate that this case may have been assigned back to Magistrate Judge Kim, the Court retained this case after conferring with Magistrate Judge Kim; additionally, no party asked that the case be reassigned to Magistrate Judge Kim and plaintiff resides in the Western Division.
[7] Magistrate Judge Kim also found that the ALJ erred in the credibility analysis.
[8] This evidence included the following: (i) Dr. Mahmood's two initial 50-minute assessments; (ii) a progress note stating that, although plaintiff had showed improvement, he was still "anxious and not in remission"; (iii) the fact that Dr. Mahmood had increased medication dosages, suggesting that plaintiff's

Oberlander did not point to any diagnostic method Dr. Mahmood failed to use. Third, the ALJ failed to apply the checklist of factors under the treating-physician rule. More specifically, the ALJ gave only "scant" analysis to these factors, ignored contrary evidence, and gave no credit to the fact that "Dr. Mahmood [was] delivering care within her specialty of psychiatry." R. 525-27. Judge Kim specifically remanded the case for further proceedings consistent with his opinion.

After the remand, on May 17, 2013, Dr. Mahmood completed another questionnaire. She rated plaintiff's GAF as 50 and stated that he had "[s]evere chronic persistent anxiety with hyper imposed panic attacks along with depression." R. 719. She again checked the box stating that plaintiff was incapable of low-stress jobs. R. 723. She diagnosed plaintiff with major depression, panic disorder, and generalized anxiety disorder but did not include bipolar disorder.

On July 15, 2013, a second administrative hearing was held. For the same basic reasons stated in the first hearing, Dr. Oberlander again discredited the opinions of Dr. Mahmood. On August 14, 2013, the ALJ issued his opinion finding plaintiff not disabled. He again relied primarily on Dr. Oberlander's opinion over that of Dr. Mahmood. The opinion is discussed below.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by

---

"symptoms were not adequately controlled"; and (iv) Dr. NieKamp's opinion that plaintiff's "anxiety and depression inhibits employment." R. 526, 522-23.

reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of the ALJ or Commissioner. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014).

On appeal, plaintiff's main argument, and the one this Court will focus on, is that the ALJ violated the treating-physician rule. The Government argues that the ALJ properly found that Dr. Mahmood's opinions were "extreme" and asserts that the treating-physician rule is "very deferential" and "lax" and that an ALJ "need not explicitly discuss each [checklist] factor." Dkt. #21 at 3, 4.

Contrary to these characterizations, the treating-physician rule is a key rule in disability cases. The rule directs the ALJ to "consider *all*" of the following factors in weighing *any* medical opinion: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors supporting or contradicting the opinion. 20 C.F.R. § 404.1527(c). The checklist factors are designed to help the ALJ "decide how much weight to give to the treating physician's evidence." *Bauer v. Astrue*,

532 F.3d 606, 608 (7th Cir. 2008). But within the weighing process, a treating physician's opinion receives particular consideration. It is entitled to "controlling weight" if the opinion is (i) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and if it is (ii) "not inconsistent with the other substantial evidence in [the] case." *Id.* If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it, but must proceed to the second step and determine what *specific* weight it should be given by using the checklist. *Moss v. Astrue¸* 555 F.3d 556, 561 (7th Cir. 2009).

Here, the ALJ did not follow this two-step process. The closest the ALJ came to acknowledging the rule is the following: "Although [Dr. Mahmood] is the treating physician, [her] opinions are not supported by objective medical evidence. Accordingly these opinions were not given controlling weight." R. 456. The statement that there was no "objective medical evidence" perhaps indirectly could be referring to the two components in the step one inquiry, but there is no analysis of them. It is not clear, for example, what clinical or lab techniques the ALJ believed were needed to confirm a treating physician's opinion regarding a diagnosis of bipolar disorder.[9] Indeed, psychological and psychiatric conditions are necessarily and largely diagnosed on the basis of subjective patient complaints. *Schickel v. Colvin*, No. 14 C 5763, 2015 U.S. Dist. LEXIS 165463, at *40-41 (N.D. Ill. Dec. 10, 2015). Judge Kim previously noted that Dr. Oberlander never pointed to any specific "failings in [Dr. Mahmood's] diagnostic method." R. 525. This same criticism applies after the second hearing. Despite Judge Kim's explicit criticism of Dr. Oberlander's failure to identify failings in Dr. Mahmood's diagnostic method, on remand, Dr. Oberlander parroted his same views. And, again despite Judge Kim's explicit criticism and remand order, the ALJ merely aped his previous decision.

---

[9] Of course, the discussion is very odd at the outset. Remember that the ALJ had twice already found that plaintiff was bipolar and that it was severe. R. 18, 450. And Dr. Oberlander, at the first hearing, likewise found that plaintiff was bipolar. R. 50.

As for whether Dr. Mahmood's opinions were "not inconsistent with the other substantial evidence," which is the second component of step one, the ALJ also did not explicitly answer this question. Although the ALJ offered several roving criticisms about Dr. Mahmood's opinions, which are discussed below, the ALJ did not find make a finding that there was "substantial" other evidence contradicting Dr. Mahmood's opinions. As Judge Kim noted in his opinion, Dr. NieKamp's report supported Dr. Mahmood's opinion. Again, this was a critical fact that the ALJ ignored even after Judge Kim instructed the ALJ to address it. Likewise, Dr. Pocock's observations and diagnoses were consistent with Dr. Mahmood's, although they were based on a limited treatment history. Dr. Sarlo's report, discussed below, also lends support to Dr. Mahmood's conclusions. So, other than the opinion of Dr. Oberlander's (who had previously found plaintiff to be bipolar, R. 50), there does not appear to be any contrary medical opinion.

As for the second step of the treating-physician rule, the ALJ did not explicitly apply the checklist. In this Court's view, that failure alone is a ground for a remand. *See, e.g., Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015). In light of Judge Kim's earlier finding that the ALJ only provided a "scant" analysis of these factors in the first opinion, the ALJ was on explicit notice that he needed to conduct a more systematic analysis of the factors. But again, the ALJ ignored Judge Kim's order, as well as the Administration's own regulations. Plaintiff argues that the analysis is still "brief and ambiguous." This Court agrees. Therefore, even if this Court were to follow a more implicit approach to the checklist, the Court would still find that the case must be remanded.

As for the first two factors—length of treatment and nature and extent of treatment relationship—the ALJ never set forth the basic facts about the treating relationship. Plaintiff had consistently been treated by Dr. Mahmood for more than four years and was seen at least 16

times during which time she adjusted plaintiff's medication at least 10 times. *See* Dkt. #15 at 11. Although these visits were shorter than what might be provided in a traditional therapy relationship, the fact remains that the sheer number of visits provided a longitudinal picture over a multi-year period. Moreover, as Judge Kim noted, Dr. Mahmood saw plaintiff at the start of the relationship for two extended sessions. In his second decision, the ALJ again downplayed these two visits, despite Judge Kim's proper criticism of this error. To put it in comparison terms, Dr. Mahmood examined and treated plaintiff many times over a period of years. In contrast, Dr. Oberlander only observed plaintiff at two short hearings and then only asked a few questions. Dr. Oberlander did not examine or treat plaintiff, nor could he as a medical expert. HALLEX I-2-5-32C.

Although the ALJ glossed over this larger picture, the ALJ offered three criticisms. The ALJ noted the following: (i) there were "very few actual treatment records," (ii) they were "very brief," and (iii) Dr. Mahmood "only saw [plaintiff] irregularly for 15 to 20 minutes at a time." R. 454. The ALJ apparently believed these assertions undermined the reliability of Dr. Mahmood's opinions. But the ALJ's reasoning is unclear at best. The allegations that the treatment records are "very few" and "very brief" are wrong as a factual matter. For each of the 16 visits, there is a multi-page record, which includes the results of a mental status exam, a listing of medications, a summary of plaintiff's current condition, a diagnosis, and a GAF score. One exhibit, which does not even include all of these notes, spans 49 pages. The ALJ seems to believe that there should be more detailed notes, but the ALJ has not explained whether it is reasonable to expect more or the basis for that belief. The criticism that the visits were "irregular" is also erroneous. As the ALJ elsewhere stated, plaintiff saw Dr. Mahmood "every three months." R. 455. Finally, as to the limitation that the visits lasted only 15 to 20 minutes, the ALJ did not explain why these

would undermine Dr. Mahmood's diagnosis. Putting aside whether plaintiff would have benefitted from more extensive counseling, this does not necessarily mean that Dr. Mahmood's particular relationship rendered her unable to make a diagnosis and offer an opinion. Furthermore, the ALJ's focus on the shorter sessions while twice discounting the more extensive sessions (despite being scolded by a federal judge for doing so) is classic cherry picking. *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

As for the fifth checklist factor – degree of specialization – the ALJ did not give any weight to the fact that Dr. Mahmood is a psychiatrist. This is yet another instance where the ALJ failed to address a specific criticism made by Judge Kim. A comparison to Dr. Oberlander is again warranted. As discussed below, although Dr. Oberlander was a psychologist, he admitted he did not have expertise in bipolar medication.

The remaining factors—supportability (3), consistency (4) and other factors (6)—are more general and therefore were potentially addressed by the ALJ's miscellaneous, untethered and scattershot criticisms. However, as explained below, many of these criticisms rest on cherry-picked evidence or questionable medical assumptions. . *Moon*, 763 F.3d at 722; *Rohan*, 98 F.3d at 970.

**Normal Findings.** The ALJ claimed that Dr. Mahmood's opinions were contradicted by his own "Mental Status" findings from the 16 visits, which supposedly showed essentially normal functioning. Although it is true that plaintiff had normal functioning for some visits, on other visits, problems were repeatedly noted. *See, e.g.*, R. 737, 755, 758, 761, 764, 767. For example, on May 16, 2013, Dr. Mahmood noted that plaintiff had a "constricted" affect and an "anxious" mood. R. 771-772. As with the first opinion, the ALJ ignored this contrary favorable

evidence, again despite Judge Kim's explicit criticism of this mistake. *Wallace*, No. 11 CV 4350, 2012, U.S. Dist. LEXIS 117031 at *25.

**Lack of Manic Symptoms.** Related to the above point, the ALJ observed that plaintiff did not "present with" any manic symptoms in visits with Dr. Mahmood. The implication is that plaintiff was not truly bipolar. This implication is absolutely bizarre. As noted above, the ALJ had already twice found that plaintiff suffered from bipolar disorder and that the disorder was severe, and even Dr. Oberlander, at the first hearing, found that plaintiff was bipolar. R. 18, 50, 450. Beside that critical failing, the ALJ's point is not adequately explained for several reasons. First, it is not clear what the ALJ believed qualified as manic symptoms. As noted above, on some visits plaintiff was found to be suffering from anxiety and other symptoms. *See, e.g.* R. 410 (8/24/09: plaintiff had a "elevated" affect and "anxious" mood). Second, as a statistical matter, it is not obvious that plaintiff would have had a manic episode during one of the visits. Plaintiff saw Dr. Mahmood approximately three to four times a year and reported having manic episodes four to six times a year. As the Seventh Circuit has noted, bipolar disorder is episodic. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("[The ALJ] thought the medical witnesses had contradicted themselves when they said the plaintiff's [bipolar disorder] was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic."). Third, regardless of whether plaintiff had a manic episode during a visit, he reported having them at home, and neither Dr. Mahmood nor Dr. Pocock doubted these claims. Dr. Mahmood specifically found, using her professional judgment, that plaintiff was not a malinger. Also, plaintiff's mother accompanied him on some visits, providing another source to confirm these reports. The ALJ failed to acknowledge these competing factors.

**Medication.** Several medication-related criticisms were made. For example, Dr. Oberlander at the hearing claimed that plaintiff was not taking the appropriate medication showing he "truly" had bipolar disorder. Again, at the risk of repetition, this is a very strange point because Dr. Oberlander had previously found plaintiff to be bipolar and the ALJ agreed. R. 18, 50, 450. To add another layer to this madness, the ALJ gave Dr. Oberlander's opinion great weight despite the fact that Dr. Oberlander's opinion (that plaintiff was misdiagnosed and was not bipolar) completely contradicts the ALJ's own finding that plaintiff was bipolar and the impairment was severe. Nevertheless, beside that fundamental logical flaw, here is the exchange on this point where plaintiff's counsel questioned Dr. Oberlander who in turn asked plaintiff questions:

Q        So despite the fact that he's been treating with the same psychiatrist since 2009, you believe he's misdiagnosed?

A        Absolutely. If he were truly bipolar, the medication he takes—even though that's outside of my area of expertise—would be different.

EXAMINATION OF THE CLAIMANT BY THE MEDICAL EXPERT

Q        Have you been on lithium?

A        I was on Depakote before.

Q        Have you been on lithium?

A        No.

ME:      Which is the medication of choice for bipolar disorder.

R. 487. This testimony was relied upon by the ALJ to discredit Dr. Mahmood. R. 455.

Again, setting aside the fact that the ALJ found plaintiff to be bipolar, the ALJ's conclusion is dubious. First, Dr. Oberlander conceded that determining the appropriate medication was "outside [his] area of expertise." Second, neither Dr. Oberlander nor the ALJ

credited plaintiff's statement that he had tried Depakote, but that it had caused bad side effects. Depakote is "indicated for manic or mixed episodes associated with bipolar disorder." *Physician's Desk Reference*, p. 437 (68th ed. 2014). The ALJ and Dr. Oberlander also ignored that plaintiff previously took Abilify, but had side effects. Abilify is used for acute treatment of manic or mixed episodes associated with bipolar disorder. *Physician's Desk Reference*, p. 2161. Third, Dr. Oberlander and the ALJ did not ask plaintiff about taking Prozac and Lamictal. Lamictal is used for maintenance treatment of bipolar disorder. *Physician's Desk Reference*, p. 1137. And Prozac can be used to treat bipolar disorder. Kahn & Fawcett, *The Encyclopedia of Mental Health*, 169 (1993). Consequently, several of plaintiff's medications were, in fact, used to treat bipolar disorder. There is no evidence in the record before this Court that Lamictal, Abilify, Depakote, Prozac or any combination thereof is viewed as inferior to Lithium or even that Lithium is—in Dr. Oberlander's words—the "medication of choice" for bipolar disorder, particularly for plaintiff. Dr. Oberlander's testimony seems to reflect a view that there is one simple drug used to treat bipolar disorder. But as the Seventh Circuit has noted, bipolar disorder often requires a "complex drug regimen to deal with both the manic and depressive phases of the disease." *Kangail*, 454 F.3d at 631. Indeed, Dr. Mahmood – a psychiatrist who, unlike Dr. Oberlander, can prescribe medications – was repeatedly adjusting plaintiff's various medications.

The ALJ also never considered whether financial reasons hindered plaintiff's ability to obtain or consistently take medications. The ALJ repeatedly noted that in November 2008, when plaintiff first sought treatment, that he had not taken any bipolar medications for the previous two years. R. 455, *see also* 453, 455 ("The claimant reported at the consultative examination [in] 2008 that he had not had any treatment for the prior two years."). However, the ALJ downplayed plaintiff's explanation that he lacked insurance. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th

Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin").

**Never Recommended Therapy.** The ALJ and Dr. Oberlander also faulted Dr. Mahmood for not recommending therapy. *See* R. 455 (ALJ: "The records do not show that Dr. Mahmood recommended any therapy nor any psychiatric hospitalizations."); R. 488 (Dr. Oberlander: "I'm also not impressed by the fact that here is a psychiatric provider [who] . . . has not recommended counseling, has not insisted upon counseling"). However, Dr. Mahmood did recommend therapy in her two initial assessments and explained that she was comfortable allowing plaintiff to proceed with only medication monitoring because plaintiff had "tried therapy in the past and found it to be non-effective," and he had "a good support network." R. 337. The ALJ ignored this evidence. In addition, as noted above, the ALJ failed to consider whether plaintiff's financial situation may have been another barrier.[10]

Lurking within many of these criticisms is the question of whether plaintiff was properly diagnosed as having bipolar disorder. Dr. Oberlander staked out strong ground, asserting that plaintiff "absolutely" did not have bipolar disorder, again despite having previously agreeing that plaintiff was, in fact, bipolar. R. 50. Dr. Mahmood, on the other hand, repeatedly diagnosed plaintiff with bipolar disorder and treated him with what appears to be bipolar medication. Other doctors were split, with Dr. Pocock and Dr. Sarlo (discussed below) diagnosing him with bipolar disorder but Dr. NieKamp diagnosing him with moderate-to-severe anxiety and depression instead. This is an issue that will need to be explored on remand, but a few points are worth pointing out now. First, it is true, as the Government states, that in the third psychiatric

_____

[10] This issue came up during the first hearing when plaintiff's counsel asked Dr. Oberlander whether an individual like plaintiff, who was on Medicaid, might have problems getting counseling. Dr. Oberlander agreed: "They certainly experience a level of difficulty in accessing services from the medical community that is of some significance here." R. 55.

questionnaire, Dr. Mahmood diagnosed plaintiff with major depressive disorder and panic disorder but did not mention bipolar disorder. The Government construes this to mean that Dr. Mahmood "no longer assessed Plaintiff with bipolar disorder." Dkt. #21 at 5. Based on the current record, this conclusion is equivocal. It is unclear whether Dr. Mahmood was formally changing her diagnosis or whether this was an inadvertent omission, especially since she continued to prescribe the same bipolar medications and never offered an explanation for changing her diagnosis. In any event, the ALJ did not mention this fact as a basis for his ruling. In fact, he found that bipolar disorder was a severe impairment at step two, a finding at odds with Dr. Oberlander's opinion. Second, even though Dr. NieKamp did not diagnose plaintiff with bipolar disorder, he did still diagnose him with moderate-to-severe anxiety and depression, diagnoses that seem to cover at least some of the same symptoms, and he also found that plaintiff's "overt anxiety and depression [] inhibits his ability to effectively find and maintain gainful employment." Dkt. #15 at 8 (citing R. 297). So, even if plaintiff did not have bipolar disorder (which would be contrary to the ALJ's finding that he did, R. 18, 450), this does not end the inquiry because all the medical opinions found plaintiff had fairly severe depression and anxiety.

In sum, the ALJ failed to apply the two steps required by the treating-physician rule. It is not simply that the ALJ refused to give Dr. Mahmood's opinions controlling weight, but that the ALJ apparently gave them *no* weight at all—just as he did in the first hearing.[11] This is yet another example of the ALJ's erroneous failure to comply with Judge Kim's order. The proper application of the treating physician rule should result in the total rejection (*i.e.*, assigning "no weight") of the treating physician's opinion only on rare occasions. *See* SSR 96-2p ("A finding

[11] To be fair, the ALJ did not specifically use the phrase "no weight" in the second opinion but that seems to be the logical conclusion of his reasoning. And the failure to identify the weight given to Dr. Mahmood's opinion is itself error. SSR 96-2p.

that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and adopted by the adjudicator.")

Having found that this case must be remanded based on the treating-physician rule, the Court will only briefly comment on the remaining issues. First, plaintiff has asserted two additional arguments for remand, although he focused much less attention on them. One argument is that the ALJ erred in the credibility analysis by, among other things, unfairly faulting plaintiff for not taking bipolar medication in the two-year period during 2006-07 and for not pursuing therapy. The other argument is that the hypothetical question to the vocational expert failed to include restrictions for plaintiff's moderate difficulties in concentration, persistence, or pace. Both of these arguments incorporate, and even repeat, many of the same arguments discussed at length above. These issues may be affected by how the evidence is developed on remand. For these reasons, the Court finds that further analysis would not be productive now.

Second, after the second hearing, plaintiff submitted to the ALJ a report from Dr. Gregory Sarlo, who plaintiff states evaluated him on August 1st and August 3rd of 2013 and who issued a report. Ex. 19F. Various tests, such as the Minnesota Multiphasic Personality Inventory, were administered. In the report, Dr. Sarlo diagnosed plaintiff with bipolar disorder and posttraumatic stress disorder and assessed his GAF as 40. R. 783. Among other things, the report states: "It would be very difficult for Brad and potentially harmful for Brad to attempt to maintain gainful employment and successfully manage the stresses of daily work[.]" R. 784. Dr.

Sarlo recommended that plaintiff engage in therapy focused on teaching "coping skills to help manage anxiety and depression."[12] *Id.*

The ALJ did not consider the Sarlo report because it was received just two hours after he released the decision. In her opening brief, plaintiff argued that the Sarlo report added further evidence bolstering Dr. Mahmood's opinions. In response, the Government pointed out that this evidence was not before the ALJ and thus could not be considered. In his reply, plaintiff only briefly addressed this point, stating that the Sarlo report was "entered into the record," but plaintiff did not offer any legal arguments as to why it should have been considered originally by the ALJ or now by this Court. Dkt. #22 at 2. However, the record contains a letter from the ALJ to plaintiff's counsel dated November 14, 2013 (*i.e.* several months after his decision) stating that the ALJ "may be willing to reopen" his decision in light of the Sarlo report if plaintiff submitted certain additional information relating to that report. R. 667. But the Court cannot find any statement in the record whether the ALJ acted on this information. This issue need not be resolved here because the Sarlo report can be considered on remand with all the other evidence.

## CONCLUSION

Five years ago, Judge Kim remanded this case for further proceedings consistent with his order. *Wallace*, No. 11 C 4350, 2012 U.S. Dist. LEXIS 117031 at *38. At that time, Judge Kim specifically identified no less than six errors in the ALJ's decision requiring remand. On remand, the ALJ failed to address a single one of those six errors. Not surprisingly, this case is remanded once again for the ALJ to correct the now twice identified errors. This maddening, unnecessary exercise has cost the federal government substantial resources. To avoid further

---

[12] One caveat about the Sarlo report. Although not acknowledged by plaintiff, the report states that the interviews of plaintiff on August 1st and August 3rd were not conducted by Dr. Sarlo himself but by a psychology extern. R. 774.

problems on remand, the Court recommends that a different ALJ and a different medical expert be assigned to this case.

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: June 27, 2016      By: _____
                                      Iain D. Johnston
                                      United States Magistrate Judge